UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT L. RHOADES, JR.,            )
                                   )
     Plaintiff,                    )
                                   )
v.                                 )
                                   )   CIVIL ACTION NO.
MASSACHUSETTS PROPERTY             )   09-11302-DPW
INSURANCE UNDERWRITING             )
ASSOCIATION, d/b/a                 )
MASSACHUSETTS FAIR PLAN            )
                                   )
     Defendant.                    )

MEMORANDUM AND ORDER
July 13, 2010

     This is an insurance coverage action brought by Plaintiff

Robert L. Rhoades, Jr. ("Rhoades") against Massachusetts Property

Insurance Underwriting Association ("MPIUA").  Rhoades alleges

that MPIUA breached its duty under a homeowner's insurance policy

to defend the insureds, David Walsh and his son KW, in connection

with claims asserted by Rhoades against them, and to indemnify

Rhoades for damages arising from those claims.  For the reasons

discussed below, I will grant summary judgment in favor of MPIUA.

## I. BACKGROUND

### A.   The Parties

     Rhoades is a Maine resident.  MPIUA is an unincorporated

association of every property and casualty insurer that does

business in Massachusetts.  MPIUA, which is also known as

Massachusetts Fair Plan, operates in a fashion similar to an

insurance company, and in that capacity underwrites and inspects

risks, accepts premiums, issues policies and adjusts claims.

**B.   *The Facts***

    <u>1.</u>   <u>The MPIUA Policy</u>

In 2006, MPIUA issued a homeowner's insurance policy to David and Constance Walsh, Massachusetts residents, for a period of one year starting May 1, 2006, with policy number 0761673-3 (the "MPIUA Policy").  Pursuant to this policy, the insureds include the named insureds and relatives who reside in their household.  *See* MPIUA Policy, DEFINITIONS, ¶ B.5.a.

The MPIUA Policy provides that, in the event of bodily injury or property damage ("Coverage E"), MPIUA agrees to:

> 1. Pay up to our limit of liability for the damages for which an 'insured' is legally liable. . . ; and

> 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. . . .

*Id.* at § II, LIABILITY COVERAGES, A., Coverage E - Personal Liability.

Pursuant to this policy, MPIUA also agrees to "pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of the accident causing 'bodily injury'" ("Coverage F").  *Id.* at § II, LIABILITY COVERAGES, B., Coverage F - Medical Payments to Others.

However, the MPIUA Policy provides exclusions for which

Coverages E and F do not apply.  One exclusion[1] relates to "motor vehicle liability."  The term "motor vehicle liability" is defined under the MPIUA Policy as the liability for bodily injury or property damage arising out of one of five circumstances:

(1) Ownership of such vehicle or craft by an 'insured';
(2) Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;
(3) Entrustment of such vehicle or craft by an 'insured' to any person;
(4) Failure to supervise or negligent supervision of any person involved in such vehicle or craft by an 'insured'; or
(5) Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

*Id.* at § DEFINITIONS, ¶ B.1.a.  For purposes of this definition, the term "motor vehicle" refers to (a) "[a] self-propelled land or amphibious vehicle" or (b) "[a]ny trailer or semitrailer which is being carried on, towed by or hitched for towing by a vehicle described in a. above."  *Id.* at § DEFINITIONS, ¶ B.7.

Under the "motor vehicle liability" exclusion, Coverages E and F do not apply if the motor vehicle involved falls within one of three categories:

a. Is registered for use on public roads or property;

b. Is not registered for use on public roads or property, but such registration is required by a law, or

---

[1]  Because it is dispositive of this case, I discuss only the "motor vehicle liability" exclusion in this Memorandum.  The parties have also argued – but I find unnecessary to reach – the applicability of the separate "business" exclusion.

regulation issued by a government agency, for it to be used at the place of the 'occurrence'; or

c. Is being:

(1) Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;
(2) Rented to others;
(3) Used to carry persons or cargo for a charge; or
(4) Used for any 'business' purpose except for a motorized golf cart while on a golfing facility.

*Id.* at § II - EXCLUSIONS, ¶ A.1.

Even if the exclusion set forth above does not apply, there is still no coverage for "motor vehicle liability" under the MPIUA Policy unless the motor vehicle involved falls within one of five categories:

a. In dead storage on an 'insured location';

b. Used solely to service an 'insured's' residence;

c. Designed to assist the handicapped . . . ;

d. Designed for recreational use off public roads and:
(1) Not owned by an 'insured'; or
(2) Owned by an 'insured' provided the 'occurrence' takes place on an 'insured location' as defined in Definitions B.6.a., b., d., e. or h.; or

e) A motorized golf cart that is owned by an 'insured' .
. . .

*Id.* at § II - EXCLUSIONS, ¶ A.2.

The MPIUA Policy also contains a severability of insurance clause, under which "[t]his insurance applies separately to each 'insured' [and] [t]his condition will not increase [MPIUA's] limit of liability for any one 'occurrence.'"  *Id.* at § II - CONDITIONS, ¶ B.

4

2.    The Accident

On November 4, 2006, an accident occurred on a construction site located in Massachusetts, in which Feeney Corporation was a subcontractor performing operations on behalf of the general contractor, Bayswater Development LLC.  At that time, nine-year-old KW had accompanied his father, David Walsh, to the site and was operating a caterpillar "skid steer" owned by Feeney Corporation.  David Walsh was at all relevant times the President, Treasurer, and Director of Feeney Corporation.

While operating the skid steer in reverse, KW struck Rhoades causing him injury to his right leg.  Rhoades sustained fractures to his right femur, tibia and patella, and incurred, as a result thereof, over $220,000 of medical expenses.  At the time of the accident, Rhoades was employed by Georges R. Roberts Company, a Maine corporation retained to work on the site as a subcontractor to Feeney Corporation.

On or about November 26, 2006, MPIUA received notice of a potential claim against David Walsh and KW.  Thereafter, Rhoades requested from MPIUA the payment of the limit of the liability under the MPIUA Policy, i.e., $500,000.  On June 22, 2007, MPIUA informed David Walsh and KW that, in light of its policy, it did not have any duty to defend or indemnify in connection with the claims asserted by Rhoades.  In particular, MPIUA asserted that the "motor vehicle liability" and the "business" exclusions served to exclude coverage for such claims.

On February 20, 2008, Rhoades entered into a release and
settlement agreement with David Walsh and KW together with Feeney
Corporation, Bayswater Development LLC, and Acadia Insurance
Company ("Acadia"), the commercial general liability insurer of
Feeney Corporation during the relevant time.  Pursuant to this
agreement, Rhoades reserved his own rights and was assigned the
signatories' respective rights against MPIUA.  Acadia funded the
entirety of a one million dollar settlement paid to Rhoades.

   3.   The Maine Litigation

On October 28, 2008, Rhoades brought an action for personal
injuries against David Walsh, KW, and MPIUA in the United States
District Court of Maine, *Rhoades v. Walsh, et al.*, Civil Action
No. 08-00368-DBH (the "Maine Litigation").  After being notified
of the Maine Litigation, MPIUA reiterated its position that it
would not provide defense or indemnity in connection with the
claims asserted in this lawsuit.

David Walsh and KW did not answer or otherwise defend
themselves in the Maine Litigation and were subsequently
defaulted, upon Rhoades' motion, on March 24, 2009.  Rhoades'
claims against MPIUA were dismissed on April 16, 2009 upon
MPIUA's motion for lack of personal jurisdiction.

Thereafter, Rhoades proceeded to obtain a default judgment
against David Walsh and KW.  Judgment was entered in favor of
Rhoades in the amount of $2,210,509.10, plus pre-judgment
interest on his negligence claim.

## C.   *The Procedural History*

Rhoades initiated litigation in this Court against MPIUA on August 3, 2009.  In his complaint, Rhoades alleges claims against MPIUA to reach and apply (Count I), breach of contract (Count II), liability for contribution/indemnification relating to the settlement agreement with Acadia (Count III), negligence (Count IV), declaratory judgment (Count V), and punitive damages (Count VI).  Both Rhoades and MPIUA have filed cross-motions for summary judgment on all of Plaintiff's counts.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "A 'material' fact is one 'that might affect the outcome of the suit under the governing law.'" *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 469 n.3 (1st Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Similarly, "[a] dispute about a material fact is 'genuine' only 'if a reasonable jury could resolve it in favor of either party.'"  *Id.* (quoting *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).

When assessing the merits of a motion for summary judgment, "the court must consider the record in the light most favorable

to the party opposing the motion and must indulge all inferences favorable to that party." *Evans Cabinet Corp. v. Kitchen Int'l, Inc.*, 593 F.3d 135, 140 (1st Cir. 2010).  Where as here, the parties have filed cross-motions for summary judgment, the court "must view each motion, separately, through this prism." *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).

### III.  ANALYSIS

*A.   The Applicable Legal Principles*

<u>1.</u>   <u>General Principles of Construction</u>

Under Massachusetts law,[2] "[t]he interpretation of an insurance contract is a question of law." *Boston Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 304 (Mass. 2009) (quoting *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007)).  As in any other contract, the interpretation of an insurance contract involves "constru[ing] the words of the policy in their usual and ordinary sense." *Hakim v. Mass. Insurer's Insolvency Fund*, 675 N.E.2d 1161, 1164 (Mass. 1997).  When construing an insurance policy, the court must "read the policy as written and '[is] not free to revise it

---

[2]   When the "parties have agreed to the choice of law, this court is free to 'forego an independent analysis and accept the parties' agreement.'" *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 20 (1st Cir. 2003) (quoting *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991)). Here, the parties agree that Massachusetts law governs the present dispute.  Consequently, I need not undertake further analysis regarding the choice of law.

or change the order of the words.'"  *Id.* at 1164-65 (quoting *Cont'l Cas. Co. v. Gilbane Bldg. Co.*, 461 N.E.2d 209, 212 (Mass. 1984)).  Accordingly, "[a] policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms."  *Finn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 896 N.E.2d 1272, 1277 (Mass. 2008) (quoting *Hyfer v. Metrop. Life Ins. Co.*, 61 N.E.2d 3, 5 (Mass. 1945)) (alteration in original).

When there is some doubt as to the interpretation of insurance policy language, it is appropriate to "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered."  *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 838 N.E.2d 1237, 1250 (Mass. 2005) (quoting *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 616 N.E.2d 68, 72 (Mass. 1993)).  Nonetheless, "[a]ny ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured."  *Allmerica Fin.*, 871 N.E.2d at 425.  "This rule of construction applies with particular force to exclusionary provisions."  *Id.* (quoting *Hakim*, 675 N.E.2d at 1165).  In this regard, "[w]hile the insured bears the burden of establishing coverage, the burden is on the insurer to establish the applicability of an exclusion."  *Finn*, 896 N.E.2d at 1275 (internal citations omitted).

9

### 2.   Duty to Defend/Indemnify

Under Massachusetts law, the "insurer's duty to defend is independent from, and broader than, its duty to indemnify." *A.W. Chesterton*, 838 N.E.2d at 1256. "The reason [for this disparity] is that an insurer's obligation to defend is measured by the allegations of the underlying complaint while the duty to indemnify is determined by the facts, which are usually established at trial." *New Fed Mortg. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 543 F.3d 7, 12 (1st Cir. 2008) (quoting *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir. 1989)) (alteration in original).

An insurer has a duty to defend when the allegations contained in the complaint "are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms." *Id.* (quoting *Liberty Mut. Ins. Co. v. SCA Servs., Inc.*, 588 N.E.2d 1346, 1347 (Mass. 1992)). However, "[i]nformation derived from outside the complaint may not serve to negate the duty to defend." *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 403 (1st Cir. 2009) (citation omitted).

**B.   The "Motor Vehicle Liability" Exclusion**

At the heart of the dispute over the "motor vehicle liability" exclusion is the interpretation of the term "motor vehicle" and the applicability of that exclusion to Rhoades' claims.

1.   Definition of the Term "Motor Vehicle"

The MPIUA policy defines the term "motor vehicle" as (a) "[a] self-propelled land or amphibious vehicle" or (b) "[a]ny trailer or semitrailer which is being carried on, towed by or hitched for towing by a vehicle described in a. above."  MPIUA Policy, § DEFINITIONS, ¶ B.7.  However, as Rhoades observes, the word "vehicle" is not further defined in the policy.

MPIUA argues that the "motor vehicle liability" exclusion bars coverage of Rhoades' claims based on the fact that a skid steer falls within the definition of the term "motor vehicle" set forth in the policy.  For his part, Rhoades contends that the skid steer cannot be construed as a motor vehicle under the MPIUA Policy, and thereby concludes that the "motor vehicle liability" exclusion is inapplicable in the present case.  In making this argument, Rhoades purports to rely on the definition of the terms "motor vehicle" and "motor vehicle liability policy" provided in the Massachusetts General Laws Chapter 90 ("Chapter 90"), MASS. GEN. LAWS ch. 90, §§ 1 et seq. (2009), the motor vehicle registration provisions.  Section 1 of Chapter 90 defines "motor vehicles" as follows:

> [A]ll vehicles constructed and designed for propulsion other than muscular power including such vehicles when pulled or towed by another vehicles, except . . . vehicles used for other purposes than the transportation of property and incapable of being driven at a speed exceeding twelve miles per hour and which are used exclusively for the building, repair and maintenance of highways or designed especially for use elsewhere than on the travelled part of ways. . . .

Mass. Gen. Laws ch. 90, § 1 (2009) (emphasis added).  In addition,
Section 34A of Chapter 90 defines "motor vehicle liability
policy" as follows:

> [A] policy of liability insurance which provides
> indemnity for or protection to the insured and any person
> responsible for the operation of the insured's motor
> vehicle with his express or implied consent against loss
> by reason of the liability to pay damages to others for
> bodily injuries.

*Id.* § 34A.[3]

Rhoades contends his position is supported by the fact that
Massachusetts Courts have interpreted Chapter 90 very broadly.  I
find, however, that the case law upon which Rhoades purports to
rely is not relevant to the question whether the skid steer is a
motor vehicle *under the terms of the MPIUA Policy*.  In *MacLean v.
Hinghman Mutual Fire Insurance Co.,* 750 N.E.2d 494 (Mass. App.
Ct. 2001), for example, the issue was whether the injuries caused
by an all-terrain vehicle ("ATV") fell within the motor vehicle
liability exclusion provided in the homeowner's insurance policy.
*Id.* at 495.  However, the policy involved in *MacLean* also
contained an *exception* to the exclusion, which stated that the
exclusion did not apply to "a motorized land conveyance designed
for recreational use off public roads, not subject to motor

---

[3]  The term "motor vehicle" used in Section 34A of Chapter
90 is defined by reference to the definition provided in Section
1 of that chapter.  Mass. Gen. Laws ch. 90, § 34A (2009) ("'Motor
vehicle', shall, in addition to the meaning prescribed by section
one, include a trailer, as defined by said section one.").

vehicle registration." *Id.* It was the presence of this exception that led the court in *MacLean* to consult the definition "motor vehicle" set forth in Chapter 90 and to conclude that an ATV was not a "motor vehicle" subject to motor vehicle registration under the statute. *Id.* at 496. As the court noted "[w]ere the *exclusion* the only provision speaking to this issue, the plaintiff's injuries would not be covered." *Id.* at 495. By contrast, the MPIUA Policy does not provide any *exception* to the exclusion. Rather, the policy merely provides, in relevant part, that the term "motor vehicle" refers to "[a] self-propelled land or amphibious vehicle" *Id.* at § DEFINITIONS, ¶ B.7.

Alternatively, Rhoades argues that the term "motor vehicle" is ambiguous given the statutory definitions and the undefined word "vehicle" in the policy. "An ambiguity arises when there is more than one rational interpretation of the relevant policy language." *Boston Gas*, 910 N.E.2d at 305 n.32. "However, an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Id.* (quoting *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.*, 645 N.E.2d 1165, 1168 (Mass. 1995)).

Here, while the term "vehicle" is not separately defined in the policy, the definition of the term "motor vehicle" is sufficiently clear so that an objectively reasonable insured, reading the policy language, could not expect that liability arising out of the use of a skid steer would be covered. Indeed,

13

"[a] policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *Whittaker Corp. v. Am. Nuclear Insurers*, 671 F. Supp. 2d 242, 247 (D. Mass. 2009) (quoting *High Voltage Eng'g Corp. v. Fed. Ins. Co.*, 981 F.2d 596, 600 (1st Cir. 1992)) (alteration in original).   The definition of the term "motor vehicle" is not ambiguous in the MPIUA policy and there is, as a result, no occasion to resort to the specific definition set forth in Chapter 90.   Having concluded as a matter of law that the skid steer qualifies as a motor vehicle for purposes of the "motor vehicle liability" exclusion of the policy, I now turn to the issue of whether the exclusion bars coverage of Rhoades' claims.

    2.   <u>Applicability of the Exclusion</u>

    Under the "motor vehicle liability" exclusion of the policy, the insurer is relieved from its duty to defend and indemnify in two sets of circumstances.   *First*, the MPIUA Policy provides that Coverages E and F do not apply to, among others, any "motor vehicle liability" if, at the time and place of the occurrence, the motor vehicle involved is registered for use on public roads or property.   MPIUA Policy, § II - EXCLUSIONS, ¶ A.1.   Here, there is no dispute as to whether the skid steer was registered for use on public roads or property.

    *Second*, the MPIUA Policy provides that, even if the exclusion set forth in paragraph A.1. does not apply, there is

still no coverage for "motor vehicle liability" unless the motor vehicle involved is (a) in dead storage on an "insured location," (b) used solely to service an "insured's' residence," (c) designed to assist the handicapped, or (d) designed for recreational use off public roads.  *Id.* at § II - EXCLUSIONS, ¶ A.2.  None of these categories apply here.  Rather, the record shows that the skid steer involved was neither in dead storage nor was it used to service an insured's residence.  Similarly, the evidence demonstrates that the skid steer was not designed to assist the handicapped or for recreational use off public roads. Accordingly, I conclude as a matter of law that the "motor vehicle liability" exclusions bars coverage for Rhoades' claims.

**C.    The "Train of Events" Test or Proximate Cause**

Relying on the "train of events" test, Rhoades argues that he is entitled to coverage regardless of whether the "motor vehicle liability" exclusion applies because his injuries arose out of two covered risks - the negligence of KW and the negligent supervision of KW by David Walsh.

As outlined by the Supreme Judicial Court in *Jussim v. Massachusetts Bay Insurance Co.*, 610 N.E.2d 954 (Mass. 1993), the "train of events" test provides that if the efficient proximate cause of a loss is an insured risk, "there will be coverage even though the final form of the property damage, produced by a series of related events, appears to take the loss outside the terms of the policy."  *Id.* at 955-56.  In *Jussim*, the plaintiff's

property was contaminated by fuel oil spilled in the basement of a neighboring home, which had spread in the soil and wells of the plaintiff's home. *Id*. at 955. While the policy excluded loss caused by pollutants, the plaintiff, relying on the "train of events" test, argued that its property damages were caused by the negligence of others which was covered by the policy. *Id*. Applying the "train of events" test, the court in *Jussim* concluded that, although the plaintiff's loss constituted an event excluded under the policy, the negligence of others was the efficient proximate cause of the plaintiff's loss and that, as result, the plaintiff could recover. *Id*. at 957.

*Jussim* is inapposite here based on two separate circumstances. *First*, the insurance policy at issue in *Jussim* was a first-party insurance policy. "First-party policies cover *physical loss or damage to the insured's property*, and protect against 'fortuitous losses,' that is, losses caused by actions outside of the policyholder's control such as the negligent conduct of others." *Utica Mut. Ins. Co. v. Hall Equip., Inc.*, 73 F. Supp. 2d 83, 92 (D. Mass. 1999). By contrast, the MPIUA Policy is a third-party policy. "Third-party policies are intended to protect the insured from liability for *damage suffered by third parties*." *Id*. *Second*, the negligence of third parties in *Jussim* caused the oil to spill on adjacent property and spread onto and damage the insured's property while Rhoades' injuries were caused by the insureds themselves.

16

The First Circuit has recognized that the "train of events"
test does not apply when these two circumstances are present.
*See U.S. Liab. Ins. Co. v. Bourbeau*, 49 F.3d 786, 790 (1st Cir.
1995); *see also Utica,* 73 F. Supp. 2d at 91-93.   In *Bourbeau,* the
insurer sought a declaration, based on an absolute pollution
exclusion, that a third-party commercial general liability policy
it had issued did not cover losses sustained by third parties
when the insured negligently released contaminated paint chips
while performing a painting contract.   49 F.3d at 787.   The
insured argued that he was entitled to coverage under the "train
of events" test because the cause of the pollution damage was a
covered risk, i.e., his alleged negligence while performing the
painting contract, even if the result of his negligence, was
pollution.   *Id.* at 789.   The First Circuit concluded that the
"train of events" test did not apply in *Bourbeau* because the test
was confined to first-party policies and inapplicable in the
context of third-party policies and because the damage in that
case was caused by the insured himself.   *Id.* at 790.

Rhoades' purports to limit *Bourbeau*'s reach by relying on
*Western Alliance v. Gill*, 686 N.E.2d 997 (Mass. 1997).   In *Gill*,
the Supreme Judicial Court held that carbon monoxide from a
restaurant oven was not a pollutant within the meaning of a
pollution exclusion clause.   686 N.E.2d at 1000.   Finding that
exclusion provisions should be interpreted in a "commonsense
manner with due attention to the circumstances of the accident

17

giving rise to a coverage claim," the court in *Gill* held that the harm at issue was not caused by the kind of release that an ordinary insured would understand as pollution.  *Id.* at 998-1000. However, Rhoades's reliance on *Gill* is misplaced because *Gill*'s discussion of *Bourbeau* does not concern *Bourbeau*'s analysis of the distinction between first and third-party policies or the applicability of the "train of events" test articulated in *Jussim*.

Accordingly, I conclude that, because the MPIUA Policy is a third-party policy and Rhoades' injuries were caused by the insureds themselves, the "train of events" test does not apply to bar coverage of Rhoades' claims.

**D.   *The Implication of the Severability Clause***

Rhoades further contends that the severability clause contained in the MPIUA Policy provides coverage of his negligent supervision claim against David Walsh despite any exclusions. The severability clause provides that the MPIUA Policy applies separately to each insured provided that this will not increase MPIUA's liability arising out of a single incident.  MPIUA Policy, § II - CONDITIONS, ¶ B.  "Severability clauses, such as the one in [the MPIUA Policy], generally operate to limit the meaning of the term 'insured party' in an exclusion clause to the party actually seeking coverage." *Lumberman's Mut. Cas. Co. v. Hanover Ins. Co.*, 645 N.E.2d 35, 38 (Mass. App. Ct. 1995) (citing

18

*Desrosiers v. Royal Ins. Co. of Am.*, 468 N.E.2d 625, 627 (Mass. 1984)).

Rhoades contends that the accident "arises out of" a covered risk because the claim is based not on the use of a motor vehicle but rather on the separate and distinct claim of negligent supervision of a minor by David Walsh.[4]  In support of his argument, Rhoades relies upon two cases suggesting a motor vehicle exclusion would not preclude coverage under an insurance policy for claims based on the theory of negligent supervision by a parent insured, which could be considered separate and distinct from the claim based on the negligent use by an insured child of a motor vehicle resulting in personal injuries.  *Shamban v. Worcester Ins. Co.*, 710 N.E.2d 627, 630 (Mass. App. Ct. 1999); *Worcester Mut. Ins. Co. v. Marnell*, 496 N.E.2d 158, 159 (Mass.

_____

[4] I note that the MPIUA Policy expressly excludes, as part of the "motor vehicle liability," the "[f]ailure to supervise or negligent supervision of any person involved in [a] vehicle or craft by an 'insured.'"  MPIUA Policy, § DEFINITIONS, ¶ B.1.a.(4).  The scope of the "motor vehicle liability" exclusion is therefore not limited, as Rhoades appears to suggest, to the ownership of a motor vehicle.  Remarkably however, this aspect of the "motor vehicle liability" exclusion was not raised by Defendant until a passing reference in its Reply brief to which Rhoades would not have a right of sur-reply without special order of this court, an order Rhoades has not sought.  Ordinarily arguments raised for the first time in a reply brief are not given consideration.  *Cf. Esso Standard Oil Co. (P.R.) v. Rodriquez Perez*, 455 F.3d 1,6 (1st Cir. 2006).  Nevertheless, paragraph B.1.a.(4) of the MPIUA Policy referenced above appears to be dispositive of Rhoades' claim of negligent supervision through the severability clause.  I will, however, address more fully the developed dispute between the parties regarding the applicability of *Worcester Mutual Insurance Co. v. Marnell*, 496 N.E.2d 158, 159 (Mass. 1986) and other related cases.

1986).  In *Shamban,* the insureds were charged with negligent supervision of their fifteen-year-old son in allowing him to operate a dirt bike owned by him, which allegedly resulted in personal injuries of his riding companion.  *Shamban*, 710 N.E.2d at 628.  In *Marnell*, the claim for negligent supervision claim was based on the insureds' failure to supervise adequately their son, who became intoxicated and caused the death of another person while operating a motor vehicle owned by him.  *Marnell,* 496 N.E.2d at 159.

I find the line of cases of which *Shamban* and *Marnell* are part ultimately unhelpful to Rhoades.  In both cases, the relevant discussion was directed not to the theory advanced by Rhoades, but rather to the fact that the vehicle involved in the accident was not owned or operated by the severably considered insureds under the policy.  *Marnell,* 496 N.E.2d at 160-61; *Shamban,* 710 N.E.2d at 630-31.  As the court in *Marnell* observed, the purpose behind the automobile exclusion was "to prevent[] the homeowners' policy from providing additional insurance without a premium, to an insured when a motor vehicle owned or operated by that person is involved in an accident causing bodily injuries or property damage."  *Marnell,* 496 N.E.2d at 161.  In the same vein, the Appeals Court has explained that:

> The homeowner who owns and operates an automobile
> ordinarily procures automobile insurance and also
> determines the amount of that coverage. The homeowner can
> reasonably be expected to rely on that coverage for
> activities related to the ownership and operation of a
> motor vehicle unless . . . a premium is paid for

> supplemental automobile insurance under the homeowners'
> policy. In contrast, when the homeowner is subjected to
> claims as a social host or negligent supervisor for
> actions of persons operating vehicles owned by others,
> the homeowner does not usually control the amount of
> automobile insurance covering the operator or owner of
> such vehicles.

*Merrimack Mut. Fire Ins. Co. v. Sampson*, 550 N.E.2d 901, 904 (Mass.

App. Ct. 1990) (discussing *Marnell*); *see also Phoenix Ins. Co. v.

Churchwell*, 785 N.E.2d 392, 395 (Mass. App. Ct. 2003) ("where the

vehicle involved in the accident was owned and operated by [the

insured], we conclude the judge properly ruled that the motor

vehicle exclusion in her homeowner's policy barred coverage for the

[victim's] injuries").

This approach has been applied to cases where the insured

simply owned the vehicle involved, but did not operate the

vehicle at the time of the accident. *See, e.g., Soc'y for

Christian Activities v. Markel Ins. Co.*, 795 N.E.2d 545, 546

(Mass. 2003) (finding that the automobile exclusion applied

because "unlike in the *Marnell* case, the [plaintiff] owned the

vehicle that was involved in the accident"); *Town of Ayer v.

Imperial Cas. & Indem. Co.*, 634 N.E.2d 571, 573 (Mass. 1994)

("because [the insured] owned the police cruiser involved in the

motor vehicle accident, the automobile exclusion provision in the

law enforcement policy relieves [the insurer] of any duty to

indemnify and defend [the insured] with respect to claims arising

from that accident"); *Merrimack*, 550 N.E.2d at 904 ("the owner or

operator of a motor vehicle involved in an automobile accident

causing bodily injuries or property damage is not entitled to be defended against claims of negligent supervision") (discussing *Marnell*).  Thus, where the motor vehicle involved was effectively or functionally owned or operated by the insured, Massachusetts case law will read the motor vehicle exclusion contained in the insured's homeowner's policies to bar coverage for the injuries.

Here, the vehicle involved in the accident was nominally owned by Feeney Corporation.  But because David Walsh was, at the time of the accident, the President, Treasurer, and Director of Feeney Corporation, it can hardly be disputed that David Walsh or his agents procured comprehensive general liability insurance for the motor vehicle involved in the accident and also determined the amount of that coverage.  Under these circumstances, David Walsh could be expected to rely on that coverage – and not his homeowner's policy – for accidents related to the skid steer.  As noted in *Merrimack*, in a parallel circumstance, "[t]he automobile exclusion was obviously intended to omit from the homeowner's policy coverage which is obtainable under an automobile insurance policy."  550 N.E.2d at 904.  I conclude, as a matter of law, that Rhoades' injuries, which were compensated under the settlement agreement funded by Acadia, the commercial general liability insurer of Feeney Corporation, did not fall within the Walshs' homeowner policy.  The "motor vehicle liability" exclusion relieved MPIUA of any duty to indemnify and defend Walsh with respect to the negligent supervision claim asserted by Rhoades.  This result reflects the proper and anticipated

allocation of risks developed by Massachusetts case law between an insured's homeowner's policy and other, more specific, insurance policies.[5]

### IV.   CONCLUSION

I conclude as a matter of law that MPIUA had no duty to defend or indemnify in connection with the claims asserted by Rhoades. Accordingly, I GRANT the summary judgment motion of MPIUA (Docket No. 21) and DENY the summary judgment motion of Rhoades (Docket No. 19).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[5] Indeed, it appears that the MPIUA Policy was drafted to include language in the definitional Section, paragraph B.1.a.(4), designed precisely to exclude coverage for any negligent supervision claims which might be raised under a *Marnell* theory.  *See* Note 4 *supra*.